UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
EDWARD ADEDEJI,

                              Plaintiff,                         NOT FOR PUBLICATION
                                                                **MEMORANDUM & ORDER**
         - against -                                            09-CV-04046 (CBA)

POLICE OFFICER JOHN HODER,                                      **FILED**
                                                               IN CLERK'S OFFICE
                              Defendant.                       U.S. DISTRICT COURT E.D.N.Y.
-------------------------------------------------------------------x          ★ **MAR 27 2013** ★

AMON, Chief United States District Judge.                       **BROOKLYN OFFICE**

         Plaintiff Edward Adedeji brought this action pursuant to 42 U.S.C. § 1983 alleging

various constitutional violations and state law claims against the City of New York (the "City")

and Police Officer John Hoder.  After a three-day trial, a jury determined that Officer Hoder had

used excessive force in violation of Adedeji's Fourth Amendment rights and awarded Adedeji

zero dollars in compensatory damages, $1 in nominal damages, and $1,000 in punitive damages.

Officer Hoder now moves (1) for judgment as a matter of law pursuant to Rule 50 of the Federal

Rules of Civil Procedure ("FRCP") or, in the alternative, (2) to set aside the jury's award of

punitive damages.  Adedeji, meanwhile, seeks a new trial on the issue of compensatory damages.

For the reasons given below, the Court denies all post-trial motions.

## BACKGROUND

**I.  History of the Case**

         This action arose out of Adedeji's interactions with Officer Hoder during Adedeji's arrest

on October 11, 2006.  Shortly after the encounter, on or around December 5, 2006, Adedeji filed

a notice of claim with the City alleging that he was handcuffed by police officers who

subsequently "threw him down the stairs," resulting in injuries requiring "immediate medical

attention."  (DE #2.)  On September 18, 2009, Adedeji initiated this action pursuant to 42 U.S.C.

1

§ 1983 against the City and Officer Hoder.  In his complaint, Adedeji alleged that he was approached by Officer Hoder and other police officers "who suddenly searched his pockets, pushed him against the wall, verbally insulted him and arrested him, and subsequently pushed him and caused [sic] to fall down the stairs in handcuffs." (Compl. ¶ 9.)  Based on these allegations, the complaint asserted various constitutional violations, including an unreasonable search, excessive use of force, and false arrest in violation of the Fourth Amendment and Monell claims based on allegedly negligent hiring and supervision, as well as state law claims against the City based on the City's alleged negligent hiring, training and supervision.

During a discovery conference held before Magistrate Judge Marilyn Go on June 28, 2010, Adedeji stated that he was withdrawing any claim for false arrest.  (Minute Entry for June 28, 2010 Proceedings; see also DE #46.)  On January 5, 2011, defendants moved for partial summary judgment on all remaining claims except for Adedeji's Fourth Amendment excessive force claim against Officer Hoder.  The Court granted the motion in its entirety on August 18, 2011.  (DE #46.)

The Fourth Amendment excessive force claim proceeded to a jury trial on April 9, 2012. At the close of Adedeji's case, Officer Hoder moved for judgment as a matter of law pursuant to Rule 50 and, alternatively, to preclude the jury from considering punitive damages.  (Tr. 261-64.) The Court reserved judgment on both motions.  (Tr. 261, 264.)  Prior to the jury receiving the case for deliberation, Officer Hoder renewed his Rule 50 motion, but the Court allowed the case to go to the jury.  (Tr. 293.)  On April 11, 2012, the jury rendered a verdict finding Officer Hoder liable for using excessive force against Adedeji and awarding no compensatory damages, $1 in nominal damages, and $1,000 in punitive damages.  (DE #79.)

2

## II. Evidence at Trial

The events at issue occurred on October 11, 2006 in a stairway in the building in which Adedeji lived. At trial, Adedeji stated that after his work shift ended around 3:30 in the afternoon, he headed home to meet a friend who lived in the same building to celebrate his birthday. When he arrived at the building, he stopped to greet a group of men who were drinking out front and then, after receiving a phone call from his friend reminding him not to be late, continued inside the building to meet his friend. He initially attempted to take the elevator, but so as not to be late if the elevator was delayed, proceeded up the stairs instead. (Tr. 25-28.)

It had been raining that day, and, the parties agree, the stairs leading up to Adedeji's apartment were wet and slippery from tenants tracking in water from outside. (Tr. 29, 88, 136, 140, 214.) Officer Hoder testified that in addition to the rain water, he also observed liquor on the floor, and that the fact that the stairs were wet raised a safety concern. (Tr. 136-37, 140.) Officer Feliciano, Officer Hoder's partner, added that the stairway was "lightly dim" and that he had observed Officer Hoder fall down a flight of stairs in another building in the area earlier that day as a result of, he believed, "the weather conditions." (Tr. 199, 230.)

As Adedeji headed up the staircase, he encountered another building resident, Isadine, who had been walking down, and stopped on the fourth floor landing to speak with him. (Tr. 30-31.) While they were speaking, Adedeji testified that they heard footsteps coming from below, at which point, Isadine ran past him up the stairs. (Id.) Adedeji stated that he remained on the landing when Officer Hoder came running up the stairs. (Tr. 31.) Officer Hoder, Adedeji testified, proceeded to place two hands on Adedeji's chest and push him against the wall while ordering him, with profanities, not to move and to get on the wall. (Tr. 31-32, 114.)

3

Adedeji testified that Officer Hoder then reached to search his pockets and that in response, he "moved his hands away and . . . took a step back from him," protesting that he had identification and lived in the building. (Tr. 32.) Officer Hoder then made a second attempt to reach into his pocket, which Adedeji again deflected, when Officer Feliciano arrived and, according to Adedeji, "came up more aggressive." (Tr. 33.) Although his testimony on this point is unclear, Officer Hoder suggested that this exchange with Adedeji made him potentially "a little frustrated that he, why he was acting the way he was." (Tr. 126.) Officer Hoder turned Adedeji around and placed handcuffs on him while Officer Feliciano searched him. (Tr. 34, 143.) Although he continued to protest that he had identification on him showing that he lived in the building, Adedeji "just let him go in my pockets." (Tr. 33-34.) Adedeji, all parties agree, did not resist being placed in handcuffs with his hands clasped behind his back and, once handcuffed, was generally compliant. (Tr. 34, 38, 143, 227.) Adedeji conceded that the search of his pockets revealed a "work knife," but, as both officers testified, it was a "legal knife" that Adedeji explained was used in his job to "cut insulation." (Tr. 34-35, 124, 202.) Adedeji stated that Officer Feliciano then told Adedeji to "move," and that he walked towards the steps but then stopped and again protested to the officers, insisting that he lived in the building and asking why he was being arrested. (Tr. 36-37.) Adedeji described his demeanor as being "very upset" and "highly angry." (Tr. 39.) Although Adedeji was not informed of this at the time, Officer Hoder testified that he was later charged with having an open container of alcohol and obstruction of governmental administration for interfering with the search of his pockets. (Tr. 119-21, 203.)

Adedeji stated that at this point, he was stopped right at the top of the steps facing down the stairwell, and that Officer Hoder, who was standing slightly behind Adedeji to his left, had his hand on the middle of Adedeji's handcuffs. (Tr. 38.) Adedeji testified: "As I asked him,

4

why am I being arrested, he told me shut the eff up and walk.  When he did that, he gave me a nudge in my back and I went down a flight of steps handcuffed." (Tr. 39.)  Adedeji claimed that he fell one full floor, "[f]rom the fourth floor top step to the third floor, to the bottom of that platform," hitting his "entire back side from waist up" as he slid down. (Tr. 40.)  When asked whether he felt anyone try to catch him, he answered in the negative stating that "[t]he steps are too steep for you to catch anyone." (Tr. 39.)  On cross-examination, while the jury viewed a picture of the stairs at issue, Adedeji testified that the stairs and walls of the stairway were concrete and metal.  (Tr. 59-60.)[1]

Officer Hoder disputed this account at trial, insisting that Adedeji never stopped walking and thus that he never needed to, nor in fact did, exert any force on Adedeji to propel him forward. (Tr. 127, 131, 161, 167-68.)  He agreed, however, that Adedeji did fall on the steps, but claimed that both of them slipped while already on the staircase and fell two to three steps at most. (Tr. 132, 161-62.)  When asked by Adedeji's counsel whether in "certain situations, i.e., a wet floor or alcohol on the steps and the suspect is cuffed, would you agree with me that it would be reckless to use force to propel that person in a stairway?"  Officer Hoder responded "Yes." (Tr. 123.)

Returning to Adedeji's account, Adedeji testified that after he came to rest at the bottom of the steps, the officers came running down the stairs, and one of them removed his handcuffs. (Tr. 40.)  Adedeji stated that when they asked him whether he needed an ambulance he answered affirmatively, despite their indication that "if you need an ambulance, you're going to go through the system.  If you're okay you can get up and walk away." (Tr. 41.)  Although Officer Hoder agreed that Adedeji did eventually request medical attention, he stated that it was not until they

---

[1] Adedeji also made statements during his testimony that he felt his handcuffs were too tight during his arrest, but his counsel clarified on the record that the handcuffing was not the basis of the excessive force claim.  (Tr. 40, 72.)

were outside the building. Officer Hoder also testified that immediately after the fall, Adedeji asserted that "he was okay" but eventually did claim that his wrist hurt. (Tr. 144, 162, 166.) Officer Feliciano testified that Adedeji complained at some point of pain to one of his arms but that he did not see any physical injuries. (Tr. 220.) After the fall, Adedeji, escorted by Officer Hoder, walked down another flight of steps and out of the building. (Tr. 41, 131, 219.) Once outside, Adedeji stated that he called his cousin, a lawyer, and told her that he was being taken to the precinct and that he had fallen down a flight of stairs and was hurt. (Tr. 42-43.) He testified that he was then re-handcuffed, taken to the precinct, and eventually brought by ambulance from the precinct to the Kings County Hospital. (Tr. 48-49.)

Aside from the trial testimony indicating that after the fall, Adedeji complained of pain to his wrist and arm, evidence that Adedeji suffered injuries caused by the nudge down the stairs consisted primarily of two sets of medical records. The first set of records, from the Kings County Hospital, indicate that Adedeji arrived there presenting primarily with pain and swelling to his wrists, shoulders, back and neck. The attending physician noted as Adedeji's chief complaint that "as per patient he was handcuffed and while he started to walk he fell on his shoulder." Adedeji complained of pain in his left shoulder and wrists, stating that "my wrist hurts, it's killing me," and was given some pain medication. A physical examination exposed some swelling in his left wrist, contusions on his wrist and shoulder, but no bleeding. X-rays taken of his left shoulder and hand revealed "no evidence of fracture or dislocation" and nothing otherwise remarkable. "Blunt force" is listed as the "presumptive diagnosis." He was discharged shortly after with instructions to use cool compresses and ibuprofen for his pain. (Pl. Ex. 4; Tr. 49, 53.) When asked on direct why he did not tell the doctors at Kings County Hospital that he had been pushed down a flight of stairs, Adedeji explained: "When I got to the

6

doctor, I didn't know what to think of the matter.  As far as me being pushed, me being like – all I know was that with the officer's force I went down the steps.  I couldn't tell him the intent on which the officer used his force for."  (Tr. 57.)

A few weeks later, Adedeji visited another physician, Dr. Roosevelt Cherubin, complaining of pain to his left wrist, left shoulder, neck and back because "[h]e fell down one flight of stairs" while handcuffed.  Dr. Cherubin observed that Adedeji's neck was swollen and showed ecchymosis and that movement and flexing of his wrists, shoulder, neck and spine elicited pain.  Based on his examination, Dr. Cherubin determined that Adedeji had sprained his neck, back and left shoulder and wrist and directed him to continue taking ibuprofen to alleviate the pain and to restrict physical activity involving lifting.  (Pl. Ex. 5; Tr. 56-57.)

In contrast to Adedeji's trial presentation of the injuries allegedly caused by the nudge and subsequent fall, Officer Hoder introduced evidence demonstrating inconsistencies in Adedeji's account of his injuries over the course of this action.  First, Adedeji's 2006 Notice of Claim was admitted, in which he attested to suffering as a result of the fall "multiple injuries, including two broken feet, damaged knees, broken back, wounds, serious lacerations and bruises."  (Tr. 69.)  Officer Hoder also introduced into evidence a portion of the complaint claiming that the force used "caused immediate injury in the form of broken bones, excessive bleeding, pain, suffering, bruises and shock."  (Tr. 283.)  On cross examination, Adedeji admitted that he did not break any bones or his back as a result of the fall.  (Tr. 67-70.)  When pressed about inconsistencies between his trial and deposition testimonies as to whether he had suffered any cuts from the fall, Adedeji clarified that the cuts he described at trial were a result of his handcuffs being "very extremely tight."  (Tr. 72.)

7

**III. The Jury's Verdict**

The jury began its deliberations on April 11, 2011, after the parties' closing arguments. During its deliberations, the jury sent the Court a note inquiring whether, with respect to liability, a "flight of stairs means all the steps or just down steps or so many steps." (Tr. 405.) The Court responded that "it is the plaintiff's contention that he fell from the top of the steps to the bottom." (Tr. 409.) To a subsequent jury note inquiring whether there is "a minimum or a maximum" punitive damages award and who is responsible for paying any such award, the Court responded that there was no maximum or minimum, and, with respect to responsibility for payment, that "[t]here is no evidence on this issue and the jury should not speculate." (Tr. 409-11.)

Later that afternoon, the jury returned with a verdict. To the question on liability, which asked the jury whether Adedeji had "proven by a preponderance of the evidence that the defendant John Hoder subjected him to excessive force by pushing or nudging him down a flight of stairs," the jury responded, "Yes." To the question on compensatory damages, which asked the jury the total amount of damages that Adedeji had proven "were proximately caused by the violation of [his] constitutional rights," the jury responded, "None." The jury then proceeded to award Adedeji $1.00 in nominal damages and $1,000 in punitive damages. (DE #79.) After the verdict was announced, the Court directed the jury to consider a Special Interrogatory, which asked: "As to your response . . . regarding the issue of defendant Hoder's liability, do you find that the defendant Hoder PUSHED plaintiff down a flight of stairs or NUDGED plaintiff down a flight of stairs?" The jury quickly returned: "Nudged." (DE #78.) Officer Hoder now moves for judgment as a matter of law or, in the alternative, to set aside the jury's award of punitive damages, while Adedeji seeks a new trial on the issue of compensatory damages. For the reasons discussed below, the Court declines to disturb the jury's verdict.

8

## DISCUSSION

### I.  Officer Hoder's Motion for Judgment as a Matter of Law

Officer Hoder claims that he is entitled to judgment as a matter of law with respect to Adedeji's excessive force claim, arguing that (1) even under Adedeji's version of events, Officer Hoder's actions were objectively reasonable under the circumstances; and (2) Officer Hoder is in any event entitled to qualified immunity.

#### A.  Standard of Review

Rule 50 "generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). In making this determination, the court should review the record as a whole but "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 150-51.

In addition, where, as here, "'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant," the moving party's burden is especially heavy. Cash, 654 F.3d at 333 (quoting Cross v. N.Y. City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005)).  The court must, in these circumstances, "give deference to all credibility determinations and reasonable inferences of the jury" and may set aside a verdict only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Brady v.

Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks and citation omitted); Kinneary v. City of New York, 601 F.3d 151, 155 (2d Cir. 2010). Put differently, a court may grant a Rule 50 motion only if, after "viewing the evidence in the light most favorable to the non-movant, [it] concludes that 'a reasonable juror would have been compelled to accept the view of the moving party.'" Cash, 654 F.3d at 333 (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)).

## B. Jury's Verdict on Liability

Officer Hoder claims that the facts, construed in the light most favorable to Adedeji, establish at best that Officer Hoder intentionally nudged forward a handcuffed arrestee who had stopped walking to prompt him to keep moving. No reasonable jury, he contends, could find this minimal use of force, which caused no compensable injury, excessive or unreasonable. (Hoder Mem. at 3.) Officer Hoder's position, however, fails to paint the full picture. Indeed, the evidence of the surrounding circumstances presented at trial—circumstances that even Officer Hoder admitted would render his actions excessive—adequately supports the jury's conclusion that Officer Hoder's conduct was unreasonable.

At core, Officer Hoder's claim rests on the premise that there exists a threshold of force or injury below which, irrespective of the surrounding circumstances, an officer's force is reasonable as a matter of law. This approach to the question of excessive force, however, misunderstands the Fourth Amendment analysis.[2] First, although a "de minimis use of force will rarely suffice to state a constitutional claim," Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993), the Fourth Amendment excessive force analysis is a contextual one that asks whether the force used "is objectively unreasonable 'in light of the facts and circumstances confronting [the

---

[2] Officer Hoder's slippery slope argument—i.e., that "[i]f the officer's conduct in this case is held to be excessive force, then essentially any force used to subdue or restrain someone that is disobeying a lawful order would be excessive force, even if the person suffered no real injury"—fails for the same reason. (Hoder Mem. at 6.)

officer], without regard to [his] underlying intent or motivation.'" Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). The inquiry does not look solely to the magnitude of the force exerted but requires close examination of the totality of the circumstances in each particular case. See Graham, 490 U.S. at 396 (noting that excessive force analysis "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake" (citations omitted)); Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000) ("A claim that excessive force was used . . . is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case . . . ."). Thus, although more substantial uses of force might, as Officer Hoder points out, be reasonable under certain circumstances, that the force at issue here is a mere "nudge" does not on its own render the jury's finding of liability unreasonable. Cf. Messina v. Mazzeo, 854 F. Supp. 116, 133 (E.D.N.Y. 1994) (noting that "a review of the case law in this circuit reveals that, as a general rule, the issue of whether excessive force was used is for the jury to decide, even though the amount of force used and the extent of injury asserted may be minimal").

The slightness of injury suffered as a result of the challenged use of force likewise does not preclude a finding that such force was objectively unreasonable. See Maxwell, 380 F.3d at 108 (noting that the Second Circuit has allowed a plaintiff's claim to survive summary judgment where use of force during course of arrest caused only bruising); Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (noting that although a jury may consider the lack of serious injury as evidence that the implemented force was not excessive, it does not entitle defendants to judgment as a matter of law); see also Felmine v City of New York, No. 09-CV-3768, 2011 WL

11

4543268, at *19 (E.D.N.Y. Sept. 29, 2011) ("The law of this circuit . . . does not appear to place a demanding requirement on excessive force plaintiffs to demonstrate injury."). Particularly where, as in this case, the force exerted carries with it a high risk of serious injury, that the plaintiff avoided that fate does not somehow lessen the unreasonableness of the force. See Wilkins v. Gaddy, 559 U.S. 34, 130 S. Ct. 1175, 1178-79 (2010) (noting in the Eighth Amendment context that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury"); see also Allen v. City of New York, 480 F. Supp. 2d 689, 708 (S.D.N.Y. 2007) (finding allegation of force that "entail[ed] a risk of severe injury" but resulted in injuries that did not appear "particularly grave" sufficient to survive summary judgment). Indeed, courts in this circuit have repeatedly allowed excessive force claims to stand where the plaintiff sustained only minor injuries. See Castro v. County of Nassau, 739 F. Supp. 2d 153, 176-77 (E.D.N.Y. 2010) (allowing excessive force claim to proceed where injury sustained consisted of handcuff imprints, redness and soreness on wrists only); Hamilton v. City of New York, No. CV-07-3633, 2009 WL 2226105, at *11 (E.D.N.Y. July 23, 2009) ("That plaintiff did not suffer a serious injury here does not entitle defendants to summary judgment on plaintiff's excessive force claim."); Sforza v. City of New York, No. 07 Civ. 6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("A plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient."). Accordingly, the fact that Adedeji may have suffered only de minimis injuries also does not invalidate the jury's conclusions about the excessiveness of the force used.

Instead, taking into account the evidence presented regarding the circumstances surrounding Officer Hoder's nudge and Adedeji's subsequent fall, the jury's conclusion that the

nudge constituted excessive force is sufficiently supported by the record.  First, the testimony of Adedeji and both officers as well as the pictures of the stairway at issue revealed that the stairs were wet, slippery, steep, and dimly lit.  They were, furthermore, made of concrete and metal.  This evidence amply supports a finding that the conditions were dangerous and posed a safety concern, an assessment Officer Hoder stated he himself made at the time. (Tr. 136-37, 140.)  Second, Adedeji's version of events, which the jury credited, indicated that, at the time of the nudge, Adedeji was stopped right at the top of the stairway, likely unprepared to step down.  He was also handcuffed and thus unable to steady himself were he to lose his balance.  According to Adedeji's testimony, moreover, Officer Hoder was holding him by the handcuffs or possibly on his upper arm, neither of which would allow him to easily secure Adedeji were he to fall.  Under such circumstances, it was reasonable for the jury to believe that any amount of force, even a slight one, propelling Adedeji forward carried with it a high risk of serious injury.  In light of this risk, Officer Hoder's nudge could, as the jury concluded, credibly constitute an objectively unreasonable use of force.  Indeed, Officer Hoder himself agreed that in "certain situations, i.e., a wet floor or alcohol on the steps and the suspect is cuffed . . . it would be reckless to use force to propel that person in a stairway." (Tr. 123.)

Officer Hoder nevertheless maintains that the jury's liability verdict fails as a matter of law because "[c]ase law in the second circuit has established that officers are allowed to use force that is much more severe than the force at issue here to effectuate the arrest of a disobedient prisoner or to move a cuffed prisoner." (Hoder Mem. at 5.) These cases, however, are inapt comparisons.  For one, cases addressing force used to subdue a suspect actively resisting arrest before being handcuffed arise in the factually distinct scenario where an officer's interest in securing the suspect clearly weighs in favor of some application of force.  See

Husbands ex rel. Forde v. City of New York, 335 Fed. App'x 124, 128-29 (2d Cir. 2009) (finding punch to arrestee's torso reasonable where arrestee resisted being placed in handcuffs and officer had previously heard gunshots coming from arrestee's direction); United States ex rel. Thompson v. Vill. of Spring Valley, N.Y., No. 05 Civ. 2005, 2006 WL 1889912, at *4 (S.D.N.Y. July 10, 2006) (finding reasonable the use of a Taser to subdue suspect who was actively resisting arrest and attempting to flee). By contrast, the force at issue here was exerted after Adedeji was placed in handcuffs with no resistance. As a number of courts in this circuit, as well as Officer Hoder himself, have recognized, "a claim of necessary force [is] much harder to maintain" after a suspect is already in handcuffs. Pierre-Antoine v. City of New York, No. 04 Civ. 6987, 2006 WL 1292076, at *4 (S.D.N.Y. May 9, 2006); see Lemmo v. McKoy, No. 08-CV-4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar. 8, 2011) (noting that "gratuitous uses of force that are not required to subdue an individual likely fail the Graham objective unreasonableness test"). In such situations, "even a minor use of force may be found to have been unreasonable." Hamilton, 2009 WL 2226105, at *10 (allowing excessive force claim alleging that officer intentionally tripped plaintiff after he was already handcuffed to proceed to trial); Lemmo, 2011 WL 843974, at *7 (denying summary judgment where officers cranked arrestee's thumbs after he was handcuffed); cf. McClendon v. Cnty. of Nassau, No. 11-CV-0190, 2012 WL 4849144, at *9 (E.D.N.Y. Oct. 11, 2012) ("Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to sustain an excessive force claim.").

This is not to say that there are not situations where applications of force are objectively reasonable even after a suspect is handcuffed or otherwise subdued. Indeed, where officers have confronted situations involving violent criminal activity or individuals who continue or appear to be continuing to actively resist arrest, courts have found various shoves, pushes and other rough

handling objectively reasonable. See, e.g., Elufe v. Aylward, No. 09-CV-458, 2011 WL 477685, at *6 (E.D.N.Y. Feb. 4, 2011) (finding reasonable officer's shove of handcuffed plaintiff into a window where plaintiff had "cut a man's neck with a six-inch knife, . . . ran from the scene in possession of the knife, and . . . was kicking his legs to the point that a law enforcement officer asked if plaintiff was trying to escape"). Here, however, it is undisputed that Adedeji did not resist being arrested and was generally compliant once he was handcuffed. (Tr. 34, 38, 143, 227.) Although in stopping at the top of the stairs to protest his arrest, Adedeji was not being fully cooperative, there was no evidence that he was attempting to flee, violent or physically resisting the arrest. Taken together with the fact that he was arrested for a minor, nonviolent violation, there is no indication that the nudge at issue was necessary to maintain the security of the situation or Officer Hoder's control over Adedeji. If anything, as discussed above, given the unsafe conditions of the stairway, Officer Hoder's use of force increased the dangerousness of the situation. Under these circumstances, the Court cannot find that the jury's conclusion regarding the excessiveness of the nudge at issue fails as a matter of law.

## C. Qualified Immunity

Following a similar line of reasoning, the Court also rejects Officer Hoder's fallback argument that the jury's liability verdict fails because he is entitled to qualified immunity.

Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In determining whether a defendant is entitled to qualified immunity, a court employs a two-pronged analysis that asks (1) "whether the facts that a plaintiff has alleged make out a violation of a constitutional right"; and (2) "whether the

15

right at issue was 'clearly established' at the time of defendant's alleged misconduct." See id. at

232 (internal citations omitted); Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010).

Since the Court has declined to upend the jury's excessive force finding, only the second prong

of the qualified immunity analysis remains, i.e., whether a reasonable officer faced with the same

factual scenario that Officer Hoder encountered would have known that his use of force was

unreasonable.  See Taravella, 599 F.3d at 133; Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir.

2002); see also Anderson v. Creighton, 483 U.S. 635, 641 (1987).

     Officer Hoder contends that "any reasonable officer would have believed it appropriate to

nudge a disobedient prisoner to get him to move.  It is impossible to imagine a less forceful

alternative use of force to persuade a disobedient arrestee, than to gently push them in order to

urge them into action." (Hoder Mem. at 8.) He adds that he "had no reason to believe any nudge

would cause plaintiff to fall down the stairs." (Id. at 9.) The same evidence that supports the

jury's finding of excessive force, however, depicts a different factual scenario—one that makes

clear that the nudge was, for substantially the same reasons the jury determined it was

objectively unreasonable, clearly unlawful. See Cowen ex rel. Estate of Cooper v. Breen, 352

F.3d 756, 764 n.7 (2d Cir. 2003) (recognizing that the two prongs of the qualified immunity

inquiry often "converge on one question: Whether in the particular circumstances faced by the

officer, a reasonable officer would believe that the force employed was lawful"); Pub. Adm'r of

Queens Cnty. ex rel. Estate & Beneficiaries of Guzman v. City of New York, No. 06 Civ. 7099,

2009 WL 498976, at *5 (S.D.N.Y. Feb. 24, 2009) ("[T]he answer to either the qualified

immunity or the Fourth Amendment question often resolves the other."); see also Bender v. Gen.

Servs. Admin., 539 F. Supp. 2d 702, 714 n.7 (S.D.N.Y. 2008) (noting that the qualified

immunity inquiry in Fourth Amendment unreasonable force cases is often "the same as the

inquiry made on the merits . . . [t]hat is, a defendant is entitled to qualified immunity only if his actions were objective[ly] reasonable[]" (internal quotation marks and citation omitted)).

First, as discussed above, it is undisputed that the stairs were wet, slippery, steep, and dimly lit. That the wet stairs presented a safety concern is a fact that Officer Hoder acknowledged at trial was apparent. (Tr. 136-37, 140.) In light of Officer Feliciano's testimony that due to the weather conditions Officer Hoder had fallen on a similar set of stairs earlier that day, it was also a very real concern. (Tr. 199, 230.) Second, it should have been clear that there was a high probability that a fall down a stairway would result in serious injury, even more so here where the steps were made of concrete and metal. Third, because Adedeji was stopped right at the top of the staircase, any force propelling him forward would undoubtedly propel him down the steps. Finally, handcuffed, Adedeji obviously had no way to steady himself were he to be caught off guard, nor was Officer Hoder holding him in a manner that would allow him to easily secure Adedeji in that event. Faced with these realities, it would have been clear to a reasonable officer that nudging Adedeji forward was not just a "gentl[e] push" to action but rather carried with it a substantial risk that Adedeji would slip and fall down the stairs—indeed, Officer Hoder admitted as much when he agreed that it would be reckless to use force to propel someone down a staircase in these very circumstances.[3] (Tr. 123.) Officer Hoder's contention that "[i]t is impossible to imagine a less forceful alternative use of force to persuade a disobedient arrestee" to move thus misses the point: in light of the high risk of serious harm, a reasonable officer in Officer Hoder's position would not have used any force, at least not before finding a way to better secure Adedeji, thus rendering the nudge gratuitous. See Lemmo, 2011 WL 843974, at

---

[3] By the same token, the proper analogy is not, as Officer Hoder contends, the fact that "parents often pull, prod, gently push, or nudge their children forward when their children refuse to walk" (Hoder Mem. at 11 n.3); rather, placed in the factual context that faced Officer Hoder, the suggestion that Officer Hoder acted toward Adedeji as any parent would to a child would require the Court to believe that a parent would think it wise to nudge her child (while holding the child's hands behind his back) down a slippery, steep, concrete stairway.

17

*6; Hamilton, 2009 WL 2226105, at *10; Davenport v. Cnty. of Suffolk, No. 99 CV 3088, 2007 WL 608125, at *10-*11 (E.D.N.Y. Feb. 23, 2007).

Finally, as discussed in greater detail below, the Court notes that the jury's determination that punitive damages were appropriate in this case makes Officer Hoder's assertion of qualified immunity "seem especially hollow." Robertson v. Sullivan, No. 07 Civ. 2972, 2010 WL 1930658, at *4 (E.D.N.Y. May 12, 2010). The Court finds it difficult to reconcile the jury's finding that Officer Hoder acted "maliciously or wantonly" and thus deserved to be punished with his after-the-fact assertion that his actions were nevertheless objectively reasonable. See id. ("The jury having found that each defendant deserved to be punished for engaging in such behavior, it is difficult to fathom the defendants' post-verdict claim that [the Court] should find them immune on the ground that [they] acted in an objectively reasonable manner."); Corcoran v. Fletcher, 160 F. Supp. 2d 1085, 1090-91 (C.D. Cal. 2001) (finding that "it would be entirely inconsistent" with the jury's finding that defendant "was either malicious or reckless in the denial of [the plaintiff's] rights to then conclude that his conduct is entitled to immunity"); cf. Long v. Bristol, No. 10-1069, 2012 WL 2864410, at *21 (E.D. Pa. July 11, 2012) ("[T]he objective standard of callous or reckless indifference that suffices for an award of punitive damages is not far removed from the standard for denying qualified immunity to the officers." (internal quotation marks and citation omitted)). Accordingly, the Court finds that qualified immunity does not shield Officer Hoder from the jury's determination that he is liable for utilizing excessive force.

## II. Challenge to the Punitive Damages Award

Officer Hoder also challenges the jury's award of punitive damages. He does not appear to specifically contest whether the evidence was sufficient to support the finding that punitive

18

damages were warranted at all but rather challenges the award as excessive within a discussion of the sufficiency of the evidence.

As the Court instructed the jury, an instruction Officer Hoder does not contest here, punitive damages may be awarded where the jury "find[s] that the acts of the defendant were done maliciously or wantonly. An act is maliciously done if it is prompted by ill-will or spite toward the injured person. An act is wanton if done with reckless or callous disregard for the rights of the injured person." (Tr. 396.) See Smith v. Wade, 461 U.S. 30, 56 (1983); Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996); Wallace v. Suffolk Cnty. Police Dep't, 04-CV-2599, 2010 WL 3835882, at *11 (E.D.N.Y. Sept. 24, 2010). Punitive damages are awarded to punish a defendant's unlawful conduct and deter any repetition of such conduct. See BMW of North America, Inc. v. Gore, 517 U.S. 559, 568 (1996).

Although Officer Hoder correctly points out that there is little, if any, evidence in the record supporting a determination that his intent in nudging Adedeji forward was to make Adedeji fall down the stairs, that does not invalidate the jury's determination about the appropriateness of punitive damages. Instead, the jury could have reasonably concluded that Officer Hoder acted with "reckless or callous disregard," a finding supported not just inferentially by the unsafe conditions but by Officer Hoder's own testimony.

As discussed above, the circumstances made clear that even a small amount of force propelling Adedeji forward carried a high risk of Adedeji falling down a flight of concrete stairs and thereby suffering serious injury. In intentionally nudging Adedeji forward, therefore, Officer Hoder disregarded a clear risk of substantial harm. Even more incriminating are Officer Hoder's own responses to Adedeji's counsel's questions regarding what he understood to be reckless behavior:

19

Q:     Would you agree with me that a suspect who's in custody, that – when a suspect is in custody, that it would be reckless to use an amount of force that will cause the suspect to be hurt?

\* \* \*

A:     Is he cuffed?

Q:     Yes.

A:     No.  There's no force, no.

Q:     And if you're aware of certain situations, i.e., a wet floor or alcohol on the steps and the suspect is cuffed, would you agree with me that it would be reckless to use force to propel that person in a stairway?

A:     "Yes."

(Tr. 123.) Thus, after determining that Officer Hoder did indeed deliberately use force, although slight, to propel Adedeji in the wet stairway, it was almost inevitable that the jury correspondingly concluded that, in light of Officer Hoder's own awareness of the unreasonableness of this behavior, that some amount of punitive damages was warranted.

With regards to Officer Hoder's claim that the amount of punitive damages is excessive, the Court points out that the jury's award of $1,000 is by no measure an award that is "'so high as to shock the judicial conscience.'" DiSorbo v. Hoy, 343 F.3d 172, 183 (2d Cir. 2003) (quoting Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)).  Nevertheless, the Court considers the award under the three guideposts articulated by the Supreme Court for determining whether a punitive damages award is excessive: "(1) the degree of reprehensibility; (2) the disparity between the harm or potential harm and the punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." DiSorbo, 343 F.3d at 186 (citing Gore, 517 U.S. at 574-75).

20

## A. Reprehensibility

Officer Hoder argues that his conduct here does not rise to the level of reprehensibility required to justify an award of punitive damages. "There are three 'aggravating factors' that are linked to reprehensible conduct. The first is whether the defendants' conduct was violent. . . . The second aggravating factor is whether the defendants acted with malice or deceit. . . . The third factor is whether the defendants have engaged in repeated acts of misconduct." Robertson, 2010 WL 1930658, at *5 (citing Gore, 517 U.S. at 576-77). Officer Hoder claims that his conduct meets none of these aggravating factors because: (1) a nudge is not violent; (2) at best, Officer Hoder's action was "unnecessarily rough" and there is no evidence that he deliberately injured Adedeji; and (3) "the record is completely devoid of evidence to show that Officer Hoder has engaged in repeated acts of misconduct in the past, namely excessive force, towards plaintiff or other arrestees so that an award of punitive damages is justified to 'punish' or 'deter' him." (Hoder Mem. at 10-11.) Although the Court agrees that the evidence of these aggravating factors in the record is largely absent, the Court finds that the diminutive award here properly accounts for that fact while also reflecting the jury's determination that Officer Hoder acted with "callous or reckless disregard."

## B. Disparity Between Harm and Punitive Damages Award

To assess the appropriateness of the ratio of punitive damages award to the harm, "the proper inquiry is 'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.'" Gore, 517 U.S. at 581 (quoting TXO Prod. Corp.v. Alliance Resources Corp., 509 U.S. 443, 460 (1993)). As Officer Hoder points out, this factor cuts strongly in favor of Officer Hoder because the jury awarded $1 in nominal damages and $1,000 in punitive damages, placing

the ratio at 1 to 1000, double the ratio the Gore Court found to be "breathtaking." See 517. U.S. at 583. The Second Circuit, however, has cautioned in the context of nominal damage awards in the § 1983 context that "the use of a multiplier to assess punitive damages is not the best tool" because in a case where the damage award is nominal, "any appreciable exemplary award would produce a ratio that would appear excessive by this measure." Lee, 101 F.3d at 811; see also Payne v. Jones, No. 09-5201-cv, 2013 WL 563528, at *13 (2d Cir. Feb. 15, 2013) ("When the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high."). Particularly here, where the potential harm from falling down a full flight of concrete and metal stairs is substantial even though Adedeji escaped unscathed, the Court does not find the large ratio troubling. See Gore, 517 U.S. at 582 (stating that this factor "compares actual and potential damages to the punitive award").

## C. Awards in Comparable Cases

The final guidepost is whether the jury award is comparable to sanctions awarded for similar conduct in other cases such that Officer Hoder would have had "fair notice" that his conduct could merit the punitive award. Gore, 517 U.S. at 574. Neither party cites any authority that either supports or undermines the amount of the jury's punitive damages award, and the Court's own review of punitive damages awards in § 1983 cases has not revealed anything on point. Nevertheless, the Court observes that an award of $1,000 is well on the lower end of the spectrum of awards in excessive force cases, see Colon v. City of New York, Nos. 09 CV 0008, 09 CV 0009, 2012 WL 691544, at *16 (E.D.N.Y. Feb. 9, 2012) (collecting cases), adopted by 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012). Especially because Officer Hoder's "training as a police officer gave him notice as to the gravity of misconduct under color of his official

22

authority," the Court finds that Officer Hoder had sufficient notice of the possibility of a small punitive award for his conduct in this action. Lee, 101 F.3d at 811.

Considering these factors as a whole, the Court declines to disturb the jury's punitive damages award in this case.

## III. Adedeji's Motion for a New Trial on Compensatory Damages

Adedeji argues that a new trial revisiting the jury's award of zero compensatory damages is necessary in light of the injuries set forth in the medical records introduced at trial. Office Hoder contends, meanwhile, that the jury's verdict on compensatory damages simply demonstrates that the jury "found that plaintiff ha[d] not proven by a preponderance of the evidence that he had suffered any compensatory damages as a result of the alleged 'nudge'." (Hoder Reply at 3.) As discussed below, because the Court finds that this issue rests largely on the jury's determination about the credibility of Adedeji's testimony regarding his injuries and their cause, the Court declines to set aside the jury's verdict on compensatory damages and order a new trial on this issue.

### A. Standard of Review

A motion for a new trial should ordinarily be denied "unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."[4] Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997)) (internal quotation marks omitted)); accord Tesser v. Bd. of Educ., 370 F.3d 314, 320 (2d Cir. 2004). Unlike under the standards governing a Rule 50 motion, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012). The court must, however, "exercise

---

[4] The Court assumes this motion was made pursuant to Rule 59 of the FRCP. Adedeji cited to no rule.

their ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depend[s] on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" Id. (quoting Metromedia Co. v. Fugazy, 983 F.2d 350, 353 (2d Cir. 1992)).

### B. Jury's Verdict on Compensatory Damages

Despite finding Officer Hoder liable and awarding punitive damages, the jury did not find Adedeji entitled to an award of compensatory damages. In a one-page submission, Adedeji asserts that a new trial is warranted because (1) "there was objective evidence in the form of medical records and the eye witness testimony of Defendant Hoder that Mr. Adedeji sustained injury as a result of being nudged down the wet stairs in handcuffs," i.e., the excessive force; and (2) "[t]here was no finding that the injuries were caused by justified force and the injuries as set forth in the [objective evidence] were not discredited." (Pl. Mot.)

As the Court instructed the jury, compensatory damages are those meant "to compensate [a plaintiff] for any injury proximately caused by the defendant's conduct." (Tr. 394.) Only where the jury concludes that the sole "injury that plaintiff suffered was the deprivation of his rights without any physical, emotional or financial damages" or is "unable to compute the monetary damages except by engaging in pure speculation and guessing" should it award nominal damages, as it did here. (Tr. 395-96.) Thus, in an excessive force claim, to recover compensatory damages a plaintiff must prove that any injury suffered was proximately caused by the unreasonable force at issue and not by some other justifiable use of force. Atkins, 143 F.3d at 103. "If it is clear from the undisputed evidence, however, that the plaintiff's injuries were caused by the use of excessive force, then the jury's failure to award some compensatory damages should be set aside and a new trial ordered." Id.

24

Based on how the parties presented the issue of whether compensatory damages were warranted at trial, the Court notes that whether Adedeji is entitled to any compensatory damages turns to a large extent on Adedeji's credibility on this issue. Adedeji introduced both testimony that he had complained of pain soon after the fall as well as medical records establishing that he suffered from some bruising, sprains, and pain several hours and even a few weeks after the incident, injuries that he reported to the treating physicians were caused by a fall down a flight of stairs while handcuffed. (See Tr. 144, 162, 166, 220; Pl. Exs. 4, 5.) The Court observes, however, that the record also contains evidence undermining the integrity Adedeji's claim that the injuries he testified to at trial were in fact real and caused by the nudge, evidence that adequately supports the jury's doubt with respect to the credibility of Adedeji's account.

First, Officer Hoder entered into evidence Adedeji's Notice of Claim and part of his complaint, both of which claimed that he suffered from broken bones, with the Notice of Claim asserting that he had broken his back. (Tr. 69, 283.) Adedeji acknowledged that many of these claimed injuries were not in fact injuries that he suffered. (Tr. 67-70.) Adedeji's counsel, moreover, suggested that one claim, that of "two broken feet," was included because Adedeji had severely injured his feet as a child and, as a result, had after the fall "some concern that [his] ankles were damaged." (Tr. 104.) In addition, Adedeji admitted at trial that some of the injuries he discussed during his testimony were a result of his handcuffs being "very extremely tight," discomfort he alluded to several times, but which he maintained was not the basis of his excessive force claim. (Tr. 40, 72.) Adedeji's testimony also intimated that both officers had been somewhat rough with him during their altercation, pushing him toward the wall. (Tr. 31.) Finally, both Officer Hoder and Officer Feliciano testified that they did not observe any physical injuries on Adedeji after the fall (Tr. 166, 220), and all parties agreed that Adedeji was able to

25

walk down another flight of steps and out of the building (Tr. 41, 131, 219). Taken together, the jury could have very well concluded that when it came to discussing the extent of his injuries, Adedeji was simply not credible and that he exaggerated both their magnitude and their cause to the physicians who examined him. The jury could have also found that Adedeji had not proven by a preponderance of the evidence that his claimed injuries were proximately caused by the nudge and not something else entirely—e.g., a pre-existing injury, his "very extremely tight handcuffs," or his pre-nudge encounter with the police. Thus, because the record does not establish that the jury's verdict on compensatory damages is "seriously erroneous" or "a miscarriage of justice," the Court declines to set aside that verdict and order a new trial on compensatory damages.

## CONCLUSION

For the reasons stated, the Court denies Officer Hoder's motion for judgment as a matter of law or, in the alternative, to set aside the award of punitive damages. The Court also denies Adedeji's motion for a new trial on compensatory damages. The jury verdict finding Officer Hoder liable for excessive force and awarding Adedeji zero dollars in compensatory damages, $1 in nominal damages, and $1,000 in punitive damages stands. The Clerk of Court is directed to terminate all pending motions, enter judgment, and close the case.

SO ORDERED.

Dated: Brooklyn, New York
       March 26, 2013

                                        S/Carol Bagley Amon
                                        Carol Bagley Amon
                                        Chief United States District Judge